UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| LEIGH FOXLEY, | ) | CASE NO. C06-0114-RSL |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| TIM CRISTMAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

INTRODUCTION AND SUMMARY CONCLUSION

Plaintiff Leigh Foxley is a Washington State prisoner who is currently incarcerated at the Monroe Corrections Complex, Twin Rivers Unit (MCC-TRU). He brings this action under 42 U.S.C. § 1983 to allege that the named defendants have denied him adequate medical care for his inguinal hernia in violation of his rights under the Eighth Amendment to the United States Constitution. Plaintiff also alleges in his complaint that defendants committed medical malpractice when they denied surgical repair of his hernia. Plaintiff identifies as defendants in this action Tim Cristman, a physician's assistant who was plaintiff's assigned medical provider at MCC-TRU, and J. David Kenney, M.D., Medical Director at MCC-TRU. Plaintiff seeks damages and an order directing that defendants have plaintiff's inguinal hernia surgically repaired.

The parties have now filed motions for summary judgment. This Court, having reviewed

REPORT AND RECOMMENDATION
PAGE -1

the parties' summary judgment motions, and the balance of the record, concludes that defendants' motion for summary judgment should be granted, plaintiff's motion for summary judgment should be denied, and this action should be dismissed with prejudice as to petitioner's federal constitutional claim and without prejudice as to plaintiff's medical malpractice claim.

## FACTS

On April 15, 2005, plaintiff injured himself while installing a gate that he had fabricated as a part of his job at MCC-TRU. (Dkt. No. 5 at 3; Dkt. No. 15-2 at 7.) According to plaintiff, his leg slipped as he and four other individuals were carrying the gate, and he felt a groin pull. (Dkt. No. 15-2 at 7.) That injury appeared to resolve itself within a couple of days and plaintiff felt better until early May when he was again injured at work while lifting large trash dumpsters. (*Id.* at 8.) Sometime following this second incident at work, plaintiff signed up to see his TRU medical provider. (*Id.* at 9.) Plaintiff was given an appointment for May 23, 2005. (*Id.*)

Plaintiff was seen by his medical provider, Physicians Assistant Tim Cristman, at his May 23, appointment.[1] (Dkt. No. 15-2 at 42.) Defendant Cristman concluded that plaintiff had an inguinal hernia. (*Id.*) However, defendant Cristman's examination showed no incarceration of the hernia and plaintiff complained of only an uncomfortable feeling. (*Id.*) Defendant Cristman therefore ordered a truss for plaintiff to help stabilize the abdomen and prevent bulges from occurring. (*Id.*) He also issued a Health Status Report ("HSR") requiring that plaintiff be

---

[1] Plaintiff asserts that when he first went in for his appointment on May 23, he was seen by an intern who asked plaintiff a series of questions, examined him, and told him he had a hernia. (Dkt. No. 15-2 at 11.) According to plaintiff, the intern told him that he was a candidate to get the hernia repaired and that he would talk to plaintiff's provider about it. (*Id.*) The intern subsequently reported back to plaintiff that the hernia would not be surgically repaired pursuant to Department of Corrections policy. (*Id*)

REPORT AND RECOMMENDATION
PAGE -2

01 provided a lower bunk and that his activities be limited to preclude heavy lifting, running, and

02 vigorous exercise. (*Id*. at 42, 47.) Finally, defendant Cristman gave plaintiff a prescription for

03 Tylenol. (Dkt. No. 15-2 at 45.) Defendant Cristman's notes from that appointment indicate that

04 plaintiff was not happy with the treatment plan and that he wanted a surgical consult. (*Id*.)

05     On May 25, 2005, defendant Cristman prepared a Consultation Request Report requesting

06 that plaintiff's case be presented to the Care Review Committee (CRC)[2]. (*See id*. at 42 and 49.)

07 On the same date, plaintiff directed a letter to Superintendent Spaulding in which he asserted that

08 he had been denied proper medical care and he requested that Superintendent Spaulding authorize

09 surgery. (Dkt. No. 16 at 9.) On June 14, 2005, defendant Kenney responded to the letter plaintiff

10 sent to Superintendent Spaulding. (Dkt. No. 16 at 10.) In his response to plaintiff, defendant

11 Kenney explained that treatments such as hernia repair needed to be discussed on a case by case

12 basis and advised that plaintiff's case would be presented to the CRC for consideration. (*Id*.)

13 Defendant Kenney also indicated in his response that the care advised by plaintiff's provider was

14 reasonable and that plaintiff should inform his provider if his condition changed. (*Id*.)

15     On June 22, 2005, defendant Cristman saw plaintiff for re-evaluation of his hernia. (Dkt.

16 No. 15-2 at 43 and 51.) The appointment took place just prior to presentation of plaintiff's case

17 to the CRC. (Dkt. No. 15-2 at 43.) Defendant Cristman's progress notes from that appointment

18 reflect that the hernia could be easily reduced, that it was 2-3cm in size, and that plaintiff neither

19 reported any intractable pain nor apparently exhibited any pain when defendant palpated the

20

---

21   [2] The CRC is comprised of Department of Corrections primary care providers, including
22 physicians, physician's assistants (PAs), and registered nurse practitioners (ARNPs), who review
the medical necessity of certain proposed care.

REPORT AND RECOMMENDATION
PAGE -3

region. (*Id*. at 51.) This was the last time plaintiff was examined by defendant Cristman.

Following plaintiff's appointment on June 22, 2005, defendant Cristman presented plaintiff's case to the CRC for approval of the requested surgical repair. (*Id*.) Defendant Cristman states that he actively advocated for plaintiff's desire for surgery, but the CRC denied the request. (*Id*.) He also states that while he advocated for plaintiff, he nonetheless agreed with the decision of the CRC. (*Id*.)

The truss which was prescribed by defendant Cristman on May 23, 2005, was finally received by plaintiff on approximately June 29, 2005. (*See* Dkt. No. 15-2 at 14.) That first truss ripped after only two months, and plaintiff signed up to receive another one. ( *Id*. at 15.) On August 31, 2005, plaintiff was seen, apparently by an ARNP, to discuss his hernia. Dkt. No. 15-3 at 44.) At that time, plaintiff reported that the hernia was painful when he was standing, but felt fine when he laid down and the hernia reduced. (*Id*.) Plaintiff also reported that his hernia belt was ripping and that even though he was wearing it 12 hours a day, the hernia would still come out of the belt and would then be "pinched." (*Id*.) He indicated that his pain was five on a scale of one to ten. (*Id*) Plaintiff further indicated that he had grieved the CRC's ruling denying him surgery. ( *Id*.) The provider observed that plaintiff was sitting comfortably during the appointment, that the inguinal mass was approximately 4-6 cm$^3$, that it was reducible, and that there was no obvious strangulation. (*Id*.) The provider issued a new hernia belt and apparently recommended that plaintiff's case be sent to the CRC for re-evaluation. ( *Id*.) It is not clear whether this re-evaluation ever took place.

---

[3] There is some question in the record regarding the accuracy of this measurement. (*See* dkt. No. 15-2 at 20.)

01	Plaintiff was next seen on October 17, 2005. (Dkt. No. 15-3 at 46.) The primary
02 encounter report appears to indicate that plaintiff reported to the provider at that time that his
03 hernia was unchanged since his August 31, 2005, appointment, that he still had occasional
04 abdominal pain, and that he had received his new truss. (*Id.*) The report further indicates that
05 plaintiff declined to be examined. (*Id.*) The provider noted that the hernia was "stable chronic."
06 (*Id.*)

07	Plaintiff was not seen again until March 17, 2006. (*Id.*) The primary encounter report for
08 that appointment reflects that plaintiff estimated the size of his hernia at about 1.5 cm. ( *Id.*)
09 Plaintiff reported that it would come out with prolonged standing, and that it would feel crampy
10 and painful when it came out. (*Id.*) Plaintiff also reported that he had gained 35 pounds due to
11 his inactivity, and that walking caused the hernia to come out even if the hernia belt was in place.
12 (*Id.*) Plaintiff indicated that he wore the belt at work where he was able to do welding projects
13 while seated at a table, and that the hernia did not come out while he was sitting. (Dkt. No. 15-3
14 at 46.)

15	Upon examination, the provider observed a small bulge, approximately 1.5 cm, but noted
16 that it reduced easily and that the tenderness resolved with reduction. (*Id.*) At that appointment,
17 the provider explained to plaintiff the criteria for surgery under the DOC plan, including intractable
18 pain and non-reducibility. (*Id*. at 47.) She also explained the need to continue monitoring the
19 hernia and to contact medical staff immediately if the hernia would not reduce. (*Id.*)

20	Plaintiff was seen on April 12, 2006, for renewal of his HSRs for a lower bunk and a hernia
21 belt. (*Id*. at 47, 49.) Plaintiff was seen again on August 24, 2006. (*Id*. at 51.) The purpose of
22 this appointment was apparently to renew a prescription unrelated to the hernia. ( *Id.*) The

primary encounter report for the appointment indicates, however, that the hernia was "unchanged." (*Id*. at 51.)

Plaintiff filed the instant action in January 2006. Defendants filed their summary motion on August 31, 2006. Plaintiff filed his summary judgment motion on the same date. Those motions are now ripe for review.

## Summary Judgment

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there exists "no genuine issue as to any material fact" such that "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is a fact relevant to the outcome of the pending action. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Genuine issues of material fact are those for which the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id*.

In response to a properly supported summary judgment motion, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts demonstrating a genuine issue of fact for trial and produce evidence sufficient to establish the existence of the elements essential to his case. *See* Fed. R. Civ. P. 56(e). A mere scintilla of evidence is insufficient to create a factual dispute. *See Anderson*, 477 U.S. at 252.

## Eighth Amendment Claim

Plaintiff alleges in his § 1983 civil rights complaint that defendants are violating his rights under the Eighth Amendment by denying him surgery necessary to repair his inguinal hernia. Section 1983 requires a claimant to prove (1) that a person acting under color of state law (2) committed an act that deprived the claimant of some right, privilege, or immunity protected by the

REPORT AND RECOMMENDATION
PAGE -6

01 | Constitution or laws of the United States. *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988).
02 | There is no dispute here that the defendants acted under color of state law. The sole issue is
03 | whether the defendants' conduct deprived plaintiff of a federally protected right.

04 | The Eighth Amendment imposes a duty upon prison officials to provide humane conditions
05 | of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes ensuring that
06 | inmates receive adequate medical care. *Id.* In order to establish an Eighth Amendment violation,
07 | a prisoner must satisfy a two-part test containing both an objective and a subjective component.
08 | The Eighth Amendment standard requires proof that (1) the alleged wrongdoing was objectively
09 | "harmful enough" to establish a constitutional violation; and (2) the prison official acted with a
10 | sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. at 834. The objective
11 | component of an Eighth Amendment claim is "contextual and responsive to 'contemporary
12 | standards of decency'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)(quoting *Estelle v. Gamble*,
13 | 429 U.S. 97, 103 (1976)). The state of mind requirement under the subjective component of the
14 | Eighth Amendment standard has been defined as "deliberate indifference" to an inmate's health or
15 | safety. *Farmer v. Brennan*, 511 U.S. at 834.

16 | Plaintiff argues in his summary judgment motion that his hernia requires surgical repair,
17 | that the standard of care for his condition is, in fact, surgical repair, that there are no risk factors
18 | present which would militate against surgical repair, and that the decision to deny him surgery is
19 | based solely on Department of Corrections ("DOC") policy. Plaintiff appears to argue that this
20 | reliance on policy over the needs of the individual constitutes deliberate indifference. Plaintiff
21 | offers in support of his summary judgment motion his own affidavit, the affidavit of a fellow
22 | prisoner, Robert Miller, and a number of exhibits including articles apparently obtained from

various internet sites which describe the treatment generally provided for inguinal hernias.

Defendants argue in their summary judgment motion that they have not acted with deliberate indifference in failing to operate on plaintiff's hernia and that plaintiff, at best, establishes only a difference in medical opinion which does not rise to the level of a constitutional violation. Defendants offer in support of their motion the declarations of both defendants, and a number of exhibits including a partial transcripts of plaintiff's deposition, plaintiff's response to defendants' first set of interrogatories and requests for production, copies of plaintiff MCC-TRU medical records, and copies of the DOC Offender Health Plan.

This Court, having reviewed all of the materials presented by the parties, concludes that the record does not establish that defendants have been deliberately indifferent to plaintiff's medical needs. Defendant Cristman diagnosed plaintiff's condition, provided care for that condition in the form of a hernia belt, a Health Status Report which ensured plaintiff a lower bunk and limited plaintiff's activities, and a prescription for Tylenol. Defendant Cristman also advocated for plaintiff's request for surgery before the CRC. Defendant Cristman has had no involvement in plaintiff's care since the date he presented plaintiff's case to the CRC. Moreover, defendant Cristman states that he did not have any authority to authorize the surgery requested by plaintiff. Plaintiff offers no evidence to the contrary. Plaintiff fails to make clear what else defendant Cristman might have done to address his medical concerns related to his hernia.

Defendant Kenney is the medical director at MCC, and was a member of the CRC which denied plaintiff surgery. Defendant Kenney has apparently never had any direct involvement in plaintiff's care. Aside from defendant Kenney's role as a member of the CRC, his only direct involvement with plaintiff appears to have been responding to plaintiff's June 14, 2005, letter to

REPORT AND RECOMMENDATION
PAGE -8

01 Superintendent Spaulding regarding the treatment recommended by defendant Cristman.

02 Defendant Keeney, in his declaration, describes generally how treatment decisions are
03 made within the DOC. He also describes how the decision was made in plaintiff's individual case.
04 Defendant Kenney explains that offender care at all DOC institutions is governed by the Offender
05 Health Plan (OHP). The OHP describes three levels of care: medically necessary (Level 1),
06 medically necessary under certain circumstances (Level II), and not medically necessary (Level
07 III). In order for surgery on an inguinal hernia to be deemed medically necessary, one of three
08 conditions must be met: (1) the patient has intractable pain despite discontinuing all non-Activities
09 of Daily Living[4]; (2) the hernia is incarcerated; or, (3) there is rapid growth of the hiatus.

10 Defendant Kenney states that the DOC does not have a blanket policy of denying requests
11 for hernia operations. Rather, requests for hernia operations which do not meet the criteria for
12 the care to be deemed medically necessary are initially deemed Level II requests and are
13 considered by the CRC on a case-by-case-basis. The CRC reviewed plaintiff's request for surgery
14 in light of the established criteria and voted to classify plaintiff's request as a Level III request; i.e.,
15 medically unnecessary.

16 Defendant Kenney states that in his professional opinion, the decision to deny plaintiff
17 surgery, and to adopt an "expectant observation" approach to plaintiff's condition was medically
18 appropriate. He notes that plaintiff's condition does not currently interfere with his activities of
19 daily living or compromise his ability to live within the institution. He further notes that the denial

---

[4] The OHP defines Activities of Daily Living or ADLs, as activities related to personal care which include bathing or showering, dressing, getting in or out of bed or a chair, using the toilet, and eating. (*See* Dkt. No. 15-3 at 20.)

REPORT AND RECOMMENDATION
PAGE -9

of surgery at this time does not cause plaintiff any harm nor does it compromise future care. Plaintiff offers nothing to refute defendant Kenney's opinion that the care he is receiving for his hernia is appropriate under the circumstances.

As noted above, plaintiff has provided the Court with printouts from internet sites which describe generally the treatment for an inguinal hernia, but those printouts do not bear the weight plaintiff assigns them. Plaintiff asserts that these printouts support his assertion that surgical repair is the standard of care for his condition. In fact, the WebMD article submitted by plaintiff states as follows:

> Not all hernias need to be treated. However, most hernias that cause symptoms or become larger should be repaired by a surgeon. While awaiting surgery, some people wear a device called a truss, which puts pressure on the hernia and keeps it under control. In people who are poor candidates for surgery because of poor health or advanced age, a truss may be used permanently.
> (Dkt. No. 16 at 28.)

The Mayoclinic.com article provided by plaintiff states "If your hernia is small and isn't bothering you, your doctor may recommend a watch-and-wait approach. But growing or painful hernias usually require surgical repair to relieve discomfort and prevent serious complications." (*Id.* at 30.) The Cornell University article provided by plaintiff suggests that surgery may be required if the hernia resists "all external repositioning efforts" or if it is large and cannot be pushed back into place. (*Id.* at 35.)

These articles, and the record as a whole, support the conclusion that the "expectant observation" approach adopted in plaintiff's case is reasonable. There is no evidence in the record that plaintiff's hernia is growing or that it cannot be reduced. In addition, plaintiff's medical records do not indicate that he has ever reported suffering intractable pain, nor do they indicate

REPORT AND RECOMMENDATION
PAGE -10

that any medical provider has ever observed any such pain during the course of their evaluations of plaintiff's condition.[5] Finally, the record reflects that not only has plaintiff been advised of the criteria for surgery, he has also been repeatedly advised that he must report any changes in his condition to the medical staff. Thus far, it appears that there have been no significant changes in plaintiff's condition since it was first diagnosed.

The record simply does not support the conclusion that defendants have exhibited deliberate indifference to plaintiff's medical needs. While plaintiff makes the point that only surgery can actually *repair* the hernia, he has not established that surgery is the only way to *treat* a hernia. At most, the controversy presented here amounts to a difference of opinion regarding the care that plaintiff should be receiving for his hernia. Differing opinions on medical treatment do not amount to a violation under the Eighth Amendment. See *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

### Medical Malpractice Claim

Plaintiff alleges in his complaint that defendants not only violated federal law, but violated state law as well. The Supreme Court has stated that federal courts should refrain from exercising their pendent jurisdiction when the federal claims are dismissed before trial. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Because defendants are entitled to summary judgment with respect to plaintiff's federal constitutional claim, plaintiff's state law claim should be dismissed

---

[5] The record indicates that plaintiff has reported experiencing some pain in certain circumstances, but it appears that he has been able to manage the pain by either reducing the hernia or by limiting his activities. Plaintiff acknowledges that he has not requested medication to control pain, but maintains that this is because he has been told that the long term use of pain medications would have serious side effects. Notably absent from plaintiff's medical records is any indication that he ever discussed pain management options with MCC-TRU medical staff.

without prejudice.

## CONCLUSION

For the reasons set forth above, this Court recommends that defendants' motion for summary judgment be granted and that plaintiff's motion for summary judgment be denied. The Court further recommends that plaintiff's complaint, and this action, be dismissed with prejudice as to plaintiff's Eighth Amendment claim and without prejudice as to plaintiff's medical malpractice claim. A proposed order accompanies this Report and Recommendation.

DATED this 5th day of December, 2006.

Mary Alice Theiler
United States Magistrate Judge